[No. B134049. Second Dist., Div. Five. Jan. 8, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY LEE HOWZE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with exception of parts B, C, E, F, G, H, and I of the Discussion.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**COUNSEL**

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WEISMAN, J.*—**

## I. INTRODUCTION

Defendant Johnny Lee Howze appeals from a judgment of conviction following a jury trial. The jury found him guilty of two counts of first degree burglary (Pen. Code, § 459; counts 1 and 2) and one count of possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a); count 3). The jury also found true allegations that defendant had previously suffered four convictions for first degree burglary (Pen. Code, § 459) that constituted serious or violent felony convictions and therefore qualified as four "strikes" under the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The jury further found true allegations that each of the four first degree burglary convictions constituted a serious felony (Pen. Code, § 667, subd. (a)(1)), and that defendant had served two separate prison terms for burglary convictions (Pen. Code, § 667.5, subd. (b)). Defendant was

---

sentenced to state prison for a total term of 90 years to life, consisting of three consecutive terms of 25 years to life on counts 1, 2 and 3, plus three consecutive five-year enhancements for prior serious felony convictions. The trial court also imposed and stayed one-year enhancements for each of the prior prison terms. Defendant contends: (1) the trial court erred in commencing trial in the absence of defendant; (2) the evidence was insufficient to sustain defendant's conviction for first degree burglary on counts 1 and 2; (3) the trial court erred in denying his motion to substitute appointed counsel; (4) the trial court erred in denying his motion to represent himself; (5) the trial court erred when it concluded that a consecutive sentence was mandated on count 2 since the court was under the mistaken belief that the offenses in counts 1 and 2 did not arise from the same operative facts and were not committed on the same occasion; (6) the evidence is insufficient to prove that defendant was the person who suffered the prior serious felony conviction in *People v. Howze* (Super. Ct. L.A. County, 1984, No. A028550), which was used to enhance his sentence by five years; (7) the trial court erred when it did not determine whether defendant was the person who committed the alleged prior convictions; (8) his sentence of 90 years to life constitutes cruel and unusual punishment under federal and state law; (9) the two enhancements for prior prison terms should be stricken rather than imposed and stayed; and (10) his presentence conduct credits were improperly calculated and he is entitled to two additional days of credit. We will order that the judgment be modified (1) to strike rather than stay the two enhancements for prior prison terms, and (2) to reflect that defendant is entitled to an additional two days of presentence conduct credit. We will affirm the judgment in all other respects.

## II. FACTUAL SUMMARY[1]

### A. *Burglary of the Kimble Residence (Count 1)*

On August 17, 1998, Richard and Lois Kimble lived at 5345 Appian Way in Long Beach. That night, Mr. Kimble went to bed first and was joined shortly thereafter by his wife. The next morning, Mr. Kimble woke up around 7:00 a.m. He was the first person in the house to wake up. He went downstairs and poured a cup of coffee. When he looked out the kitchen window, which was located about four feet above the ground, he noticed the portable butane barbecue had been moved from its usual location. Normally, the barbecue was located directly underneath the window. He observed that one corner of the barbecue had been moved away from the wall of the house

---

[1]In accord with the usual rules on appeal, we will state the facts in the manner most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

about a foot and a half. When his wife came down later, Mr. Kimble asked her if she had moved the barbecue, and she said she had not.

Mr. Kimble went outside and examined the barbecue. He noticed that little trinkets that had previously been on the kitchen windowsill had been removed and placed on the barbecue. He also saw one of their kitchen paring knives had been placed on the barbecue. The knife was normally stored in a drawer in the kitchen. He then noticed the screen over the part of the kitchen window that opened had been removed. He walked out toward Marine Stadium, which was near his house, to see if he could find the screen. He observed the screen in his neighbor's bushes.

Mr. Kimble entered his house again and inspected the area near the kitchen window. He saw that the sink was gritty, and that the window had been pried open. The window had been closed and locked the previous evening. He noticed there was a scratch on the aluminum casement of the window where it had been pried open. Mrs. Kimble also noticed that things were out of place and realized that someone had been in their house. She looked in the cabinet where she normally kept her purse and found it was missing. Her purse had contained her billfold with about $130 in cash. The purse also contained a monocle she needed due to a visual handicap, as well as special magnifying glasses and a lighted magnifying glass. A gold watch that needed to be repaired was also in the purse. About $40 in cash that she kept in a small drawer in the kitchen was also missing.

Mrs. Kimble then called the police to report the incident. She had call waiting on her phone, and while she was calling the police her neighbor, Virginia Collis, called her to tell her that she had found her purse. Ms. Collis, who lived in front of Marine Stadium at 5327 Paoli Way, had observed the purse on the ground while she was gardening, and also noticed a wallet and papers lying near the purse. She saw the name in the wallet and realized it belonged to her neighbor Mrs. Kimble. Mrs. Kimble went over to her neighbor's house, which was only five houses away, and retrieved her purse and wallet. She then returned home and inventoried the purse. She found that the cash, the monocle, the magnifying glasses, and the gold watch were all missing.

Later that day, Carmen Moncure arrived at the Kimble residence. She was an identification technician who had been employed by the Long Beach Police Department Crime Laboratory for the last six years. She checked for latent fingerprints at the Kimble residence and obtained six latent prints from the inside ledge of the kitchen window, one latent print from the tile on the wall, and one latent print from the tile around the kitchen sink, by using

black graphite powder. Manuel Lara, an identification technician employed by the Long Beach Police Department, compared the latent prints to prints taken from defendant and determined that five of the latent prints recovered from the Kimble residence were made by defendant. Specifically, one of the latent prints matched defendant's right thumbprint, one matched his left middle fingerprint, one matched his right palm print and two of the latent prints matched defendant's left palm print.

Neither Mr. nor Mrs. Kimble knew defendant, and neither of them had given him permission to enter their residence. Nobody had permission from them to enter their residence through the kitchen window.

## B. *Burglary of the Stromberg Residence (Count 2)*

On August 17, 1998, David Stromberg lived at 5307 Paoli Way in Long Beach with his wife and three children. About 10:00 p.m., he was outside in front of his residence when his wife came out and told him she observed something was wrong with a screen in the house. He went inside and observed that a screen for a bedroom window was bent outward from one of the corners at a 45-degree angle. The window was a sliding window about four and a half feet off the ground. A concrete walkway ran along the house by the window. Because the summer night was hot, Mr. Stromberg had left the window open before stepping outside. When he had stepped outside the screen was still covering the window and had not been bent.

Mr. Stromberg looked out the window through the bent screen and saw that a blue and white lawn chair or patio chair was up against the house on the walkway directly under the bent screen. He did not recognize the patio chair and it was not one that he owned. It was obvious to him that someone had used the chair to get into his house. He testified that he did not believe the chair was a folding type. Mr. Stromberg checked the house, but found no one else inside except his children.

Mr. Stromberg walked across Appian Way and saw police activity. A police officer told him that they had chased a purse snatcher into the neighborhood. Mr. Stromberg informed the police that there had been a break-in at his residence. When the police officer entered his residence and began talking to him, Mr. Stromberg noticed that his wife's purse was missing from the nightstand opposite the window, and that his own wallet was missing from the top of the bedroom dresser. He recalled that there was about $40 in his wallet.

A police officer then entered the residence and asked Mr. Stromberg if a wallet he located in a trash can belonged to him. Mr. Stromberg went outside

and saw his wallet in a trash can. He also saw his wife's purse in or near the trash can. Mr. Stromberg determined that the cash was missing from his wallet. Nothing was missing from his wife's purse. Chairs that matched the one left under his window were located at a house two doors away on Appian Way.

Later that evening, Nancy Preston, an identification technician employed by the Long Beach Police Department Criminal Laboratory, went to Mr. Stromberg's home and dusted the blue and white patio chair located underneath the bedroom window with black fingerprint powder. She obtained two latent prints from the chair. One latent print was from the side of the frame on the back of the chair, and the other was from the back of the top of the chair frame and was located almost in the middle of the frame. She testified that the chair was a folding patio type chair. The latent prints were subsequently compared with fingerprints of the defendant by Manuel Lara, an identification technician employed by the Long Beach Police Department, and it was determined that the latent print from the side of the frame was made by defendant's left ring finger, and the latent print from the back of the top of the frame was made by defendant's right ring finger. There was no way to tell how long defendant's prints had been on the chair.

Defendant did not have permission to enter Mr. Stromberg's residence, and no one had permission to bend the screen, enter the window, and take his wallet and his wife's purse. Mr. Stromberg did not know defendant and had never seen him before.

## C. *Possession of Cocaine (Count 3)*

On August 20, 1998, Long Beach Police Detective Michael Dugan and Long Beach Police Officer Joseph Bahash received information concerning the whereabouts of defendant, who had been identified as a suspect in the burglaries through the fingerprint evidence. They went to the area near Orange and First and Second and Broadway in Long Beach, where they believed defendant might be located. They observed defendant enter a liquor store at Broadway and Falcon. They entered the store and arrested defendant for burglary. After defendant was handcuffed, he was searched by Detective Dugan. Detective Dugan found a small metal container in defendant's right sock. He opened the container and observed several pieces of rock cocaine inside the container. The rock cocaine was subsequently analyzed and it was determined that it was cocaine and weighed .5 grams. In Detective Dugan's experience, a usable street quantity was about .05 grams, so the amount of rock cocaine retrieved from defendant constituted about 10 usable amounts. Detective Dugan also retrieved a glass cocaine pipe from defendant's right front pants pocket.

## III. Discussion

### A. *The Decision to Commence Trial in the Absence of Defendant*

 Defendant contends that the trial court acted in excess of its jurisdiction and violated Penal Code section 1043 when it commenced trial in defendant's absence. He also asserts that commencing trial in his absence violated his federal and state constitutional rights to be personally present at his trial. We find that defendant is estopped to assert that the trial court acted outside its jurisdiction and violated his rights when it commenced trial in his absence because he consented to the court starting trial in his absence, his absence was caused by his own deliberate conduct and was a deliberate choice on his part with knowledge of the consequences, and because he later chose to participate in the proceedings at trial when he believed it was in his interest to do so without making any objection on jurisdictional or constitutional grounds. We also find that defendant orally waived his right to appear personally at the commencement of trial, and that while such an oral waiver is not in strict compliance with the statutory requirement that waivers be in writing, defendant has failed to demonstrate any prejudice resulting from this error and is entitled to no relief.

In the instant case, the record shows defendant began his disruptive conduct, including failing to appear in court, as early as the preliminary hearing. At the preliminary hearing, defendant claimed to be possessed by two different people, including rap artist Tupac Shakur. He also claimed not to know why he was even having a preliminary hearing. After an evening recess, the preliminary hearing proceeded the next morning. However, defendant was absent from the proceedings. It was represented that defendant refused to come out of the jail for court transportation. The bailiff stated that the night before, defendant had told the bailiff he was not going to come back to court. The bailiff stated that defendant had a long history of refusing to come out of his jail cell. Evidently, defendant was eventually transported to court in time to be present for the remainder of the preliminary hearing. As soon as the testimony resumed, defendant interrupted the proceedings with "bizarre" claims that someone was "poking" him when in fact there was nobody near him. Defendant was eventually bound over for trial.

On defendant's arraignment date in superior court, October 20, 1998, it was noted that defendant did not appear and was a "miss-out." A representative of the sheriff's department informed the court that defendant had previously failed to appear for arraignment in municipal court on August 24, 25, 26, and 31, 1998, and also failed to appear on September 1, 2, and 3, 1998. He did appear and was arraigned in municipal court on September 4,

1998, but was again a "miss-out" for his preliminary hearing on September 21, 22, 23, and 24, 1998. He also was a "miss-out" for his preliminary hearing on October 1 and 2, 1998, before he was finally brought to court and his preliminary hearing began.

An extraction order was obtained from a judge prior to the arraignment date in superior court, but the court presiding at the superior court arraignment was informed that defendant had claimed to have high blood pressure, a heart problem, asthma and seizure problems. The court therefore decided it would not issue an extraction order because it could endanger the health of defendant. The court held a hearing and, after hearing evidence of defendant's past refusal to come to court and the dangers that physical removal could present due to his potential health problems, ordered that his future refusals to come to court be videotaped.[2] The court noted it was also aware that when defendant was arraigned in municipal court the municipal court judge had to arraign him in the holding cell after defendant had stripped naked in the cell and refused to come into the courtroom.

On the next court date, October 21, 1998, defendant appeared in court and started screaming. He continued to scream in court, and then "fell over on the floor" and struggled with the sheriff's deputies. Defendant was ordered removed due to his disruptive behavior. He was subsequently informed that he could come back to the courtroom if he behaved properly and did not scream. He was then brought back into court. When asked how he pled to the charges, defendant started laughing and defense counsel had to enter a plea on defendant's behalf.

On November 18, 1998, defendant refused to come to court. The court made a finding, after reviewing medical reports, that defendant was malingering and intentionally refusing to come to court. Defendant had complained to the jail staff that morning that his legs were "not functional" and that was the reason he had to stay in his cell. However, he was observed later that day and his legs appeared to be functioning properly.

On December 10, 1998, defendant refused to come to court and a hearing was held concerning his medical and mental condition. Evidence was presented that defendant had rubbed feces over his body and hands and then challenged deputies to come into the cell to extract him. When the deputies prepared to videotape defendant in his cell, he masturbated and ejaculated

---

[2]The videotapes made of defendant's refusals to come to court were viewed by the court and counsel during the course of the pretrial and trial proceedings. The videotapes were designated as court exhibits. This court had obtained the exhibits from the superior court clerk and has reviewed the videotapes in conjunction with this appeal.

toward the camera and threw food at the deputy who was doing the video-taping. The hearing was continued to the following day, and once again defendant did not come to court. The hearing was then continued to December 14, 1998, and once again defendant was not present. On that date, the court declared a doubt as to defendant's mental competence pursuant to Penal Code section 1368, and the matter was continued to January 25, 1999.

On January 25, 1999, defendant was in the court lockup, but would not speak to a psychologist who was there for a competency hearing. When defense counsel went to speak to defendant, she found he was naked in his cell. Defendant did not respond to counsel's statements except to repeatedly state "Hey." The court noted that defendant had previously "gotten naked" at court on numerous occasions, and that defendant had previously refused to talk to any mental health experts. The court indicated it still believed defendant was malingering, but appointed another psychiatrist to interview defendant in jail. The matter was continued to March 1, 1999.

On April 19, 1999, defendant was present in court and a court trial was held on defendant's competency to stand trial. The court noted that all three doctors who had been appointed to examine defendant concluded that defendant was malingering and feigning mental illness in order to avoid prosecution. The court found there was "no doubt" defendant was malingering and was competent to stand trial. Because of defendant's history of refusing to come to court on scheduled court dates, the court advised defendant personally after the competency hearing concluded as follows: "Let me tell you that you have a right to come to court every day of your trial, and you have a right to be present at each and every hearing we have on your matter. [¶] If you refuse to come out of your cell, the Sheriff has been ordered not to force you out of your cell. That will be deemed a waiver of your right to be present, and the proceedings will continue in your absence. [¶] Furthermore, if you refuse to come out of your cell when it is your trial date, and we start picking the jury and proceed to trial, it will proceed in your absence. So since that refusal will be deemed a waiver of your right to appear at trial and to confront witnesses against you, you will not thwart the judicial process by these faked attempts. It is not going to succeed. We are just going to proceed without you." Defense counsel did not object to the court's admonition and did not argue against the court's decision to treat a refusal to come to court as a waiver of a personal appearance. Defendant did not personally object to the court's admonition and did not indicate in any way that he failed to understand the consequences of a refusal to appear.

On June 15, 1999, two days before the scheduled trial date, defendant appeared in court to make a motion to substitute appointed counsel and a

motion to represent himself. Following the trial court's denial of his motions, defendant personally stated in court "Okay. I am not going to make any further appearances in court if that is the case." The court once again admonished defendant regarding a failure to appear for trial. The court stated, "Let me explain to you that you have the right to be present during your trial. If you refuse to come out of your cell, that will be deemed a waiver of your right to be present." Defendant replied, "Just take me out of the courtroom. I don't want to hear nothing. I'm not coming back, so do whatever you're gonna do. I'm not coming back."

On June 17, 1999, the scheduled trial date, defendant refused to come out of his cell at the jail. The deputy sheriff at the jail, Sergeant Escandon, read an admonishment to defendant that had been drafted jointly by the court and counsel, notifying defendant that he had a right to be present at trial, and a right to confront witnesses at trial, and that a refusal to leave his cell would constitute a waiver of those rights. Defendant stated to the deputy at the jail that he did not wish to participate in a "kangaroo court." He also stated that, "I might go later. I don't know. It's not important to me." Defendant then stated he had nerve damage and a sciatic condition that meant he could not perform procedures required prior to transportation to court, such as bending over for a search of his anal orifice. The admonishment and defendant's statements were videotaped and the tape was played in court.[3]

Defense counsel did not object that the court was without jurisdiction to proceed in the absence of defendant, and only raised the issue of whether defendant had a medical excuse for not appearing in court. The court determined that defendant was malingering again and was trying to manipulate the system for his benefit by refusing to come to court and by engaging in obstructionist behavior. The court found that defendant had voluntarily absented himself from the courtroom on the trial date. The panel of prospective jurors was then brought into court and the trial commenced in the absence of defendant.

On the following day, June 18, 1999, defendant once again was not present in court. Earlier that morning, at the jail, defendant was read the same admonition concerning his refusal to come to court, and once again his refusal was videotaped. The court decided to proceed with jury selection in the absence of defendant. Defense counsel made no objection based on a lack of jurisdiction, and specifically stated, "I have nothing to add." A jury was impaneled and the prosecution proceeded with opening statement and its case-in-chief.

---

[3]The admonition read to defendant was designated as an exhibit to the superior court file. We have reviewed the admonition contained in the file.

On the following Monday, June 21, 1999, defendant came to court for the purpose of making another motion to substitute appointed counsel. Neither defendant nor his attorney made any jurisdictional objection to the fact that the court had proceeded to commence trial on the matter in the absence of defendant. Defendant explained his past behavior was caused by his fear of the Three Strikes law and his lack of confidence in his counsel. He stated that he was "scared to go to court," and was "terrified to go to court." Counsel then pointed out that defendant's behavior, including not coming to court, started long before her representation began. The court denied the motion to substitute counsel, and mentioned that the jurors were waiting in the hallway. Defendant asked if he could "be excused from the courtroom," and said he did not want to be present during his trial. The court asked defendant if he was waiving his appearance and he said he was until he had a discussion with his attorney at the lunch break. The court then took a recess for lunch. After the lunch recess, the court noted that defendant was not in court. Defense counsel indicated that defendant had said he was not coming out for the afternoon session. Counsel did not object to the absence of defendant, and stated she was "[r]eady to proceed with the trial."

On the next day, June 22, 1999, the trial resumed and defendant once again was not present in court. On June 23, 1999, defendant came to court for the purpose of making another complaint about his representation by appointed counsel, and for the purpose of testifying in his own defense. He did not make any objection to the court commencing trial or proceeding with the trial in his absence. After hearing his complaints about counsel, the court allowed counsel to continue representing defendant. The court then allowed defendant to testify on his own behalf. Defendant testified that he did not commit the charged burglaries and claimed he was at home at the time of the burglaries. Defendant refused to answer any questions on cross-examination, and then improperly informed the jury that the People were trying to give him 140 years and "strike me out." The court sent the jury out, and before the court could admonish defendant, he stated, "I don't want to continue with this trial." Defendant acknowledged he had been warned he would be removed if there was an outburst, and stated, "Let me know when it's time for me to be sentenced." The court told him that if he did not calm down and stop volunteering comments to the jury he would be viewed as having waived his appearance. Defendant stated, "I don't want to be part of this." When the court finally ordered defendant removed and asked him if he at least wanted to listen to the proceedings on a loudspeaker, he stated, "I don't want to hear anything. This is a kangaroo court." He then reiterated, "I am not going to participate."

On the following day, June 24, 1999, defendant was not in court for jury readback of the reporter's notes, and counsel stated that she believed defendant had waived his appearance in court until sentencing. Counsel stated that

defendant did not come out of his cell to come to court that day "although he was invited."

On June 25, 1999, the jury convicted defendant in his absence of counts 1, 2, and 3 and found true the alleged enhancements. The court then drafted an admonition to defendant notifying him he had a right to be present for sentencing and that if he refused to come to court he would be sentenced in his absence. Defendant refused to come to court for sentencing on July 12, 1999, and his refusal was videotaped. Sentencing was put over for one day so the videotaped refusal could be reviewed. The next day defendant was absent once again. The videotape of his refusal to come to court was reviewed and it was determined that defendant said "No" when asked if he was going to go to court. The court proceeded to sentence defendant in his absence.

Defendant now claims on appeal that his trial was null and void because the trial was commenced in his absence. He asserts that the requirement that the defendant be present at the time of commencement of the trial is jurisdictional, that the right to be present at the commencement of trial is both a federal and state constitutional right, and that the right cannot be waived. He further argues that even if the right could be waived, there was no waiver taken in the instant case that met the formal requirements of Penal Code section 977. Respondent argues that defendant orally waived his appearance at the commencement of the trial and during the trial. Respondent further argues that defendant is estopped to assert a lack of jurisdiction to commence and proceed with the trial in his absence due to his conduct in refusing to come to court after being admonished that the trial would proceed in his absence, his express statements made in court that he was not going to come back to court for his trial and that the court could do what it wanted, his refusals to come to court after being admonished at the jail, and his willing participation and appearances at trial without objection when it suited his purposes and was for his benefit.

■ A criminal defendant has a right under the Sixth and Fourteenth Amendments to the federal Constitution, and under article I, section 15 of the California Constitution, to be present at his trial. (*People v. Hines* (1997) 15 Cal.4th 997, 1038-1039 [64 Cal.Rptr.2d 594, 938 P.2d 388].) A defendant also has statutory rights to be present under Penal Code sections 1043 and 977. (*People v. Hines, supra,* 15 Cal.4th at pp. 1038-1039.) The right to be present, however, is a right that is not absolute. For example, a disruptive defendant can be removed from the courtroom without violating his right to be present. (*Illinois v. Allen* (1970) 397 U.S. 337 [90 S.Ct. 1057, 25 L.Ed.2d 353]; *People v. Welch* (1999) 20 Cal.4th 701, 773 [85 Cal.Rptr.2d 203, 976

P.2d 754].) A defendant who voluntarily absents himself from a trial that has commenced in his presence cannot later complain when the trial continues to a verdict in his absence. (*Taylor v. United States* (1973) 414 U.S. 17, 18-20 [94 S.Ct. 194, 195-196, 38 L.Ed.2d 174]; *People v. Connolly* (1973) 36 Cal.App.3d 379, 385 [111 Cal.Rptr. 409].) A defendant can also waive his personal appearance at trial and allow the trial to proceed in his absence. (*People v. Edwards* (1991) 54 Cal.3d 787, 809 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

■ Defendant asserts that a defendant cannot waive his right to be present at the commencement of trial. He distinguishes the commencement of trial from the subsequent proceedings at trial, and claims the waiver procedure cannot constitutionally be applied to the commencement of trial. He relies on *Crosby v. United States* (1993) 506 U.S. 255, 258-262 [113 S.Ct. 748, 750-753, 122 L.Ed.2d 25], in which the United States Supreme Court had to decide "whether Federal Rule of Criminal Procedure 43 permits the trial *in absentia* of a defendant who absconds prior to trial and is absent at its beginning." (*Id.* at p. 256 [113 S.Ct. at pp. 749-750], original italics.) Rule 43 expressly required the presence of the defendant at the impaneling of the jury and other specified phases of the trial, "except as otherwise provided" by other subdivisions of rule 43. Former subdivision (b) of rule 43 provided that a defendant "shall be considered to have waived the right to be present whenever a defendant, initially present, . . . [¶] . . . is voluntarily absent after the trial has commenced . . . ." The court interpreted this language to mean that a defendant could only waive his appearance by conduct when he failed to appear after initially appearing at the time the trial actually commenced. (506 U.S. at pp. 258-262 [113 S.Ct. at pp. 750-753].) The court specifically noted it was only interpreting the exact wording of the statutory rule involved and was expressing no opinion at all on whether the right to be present at the beginning of trial could be constitutionally waived in other circumstances. (*Id.* at p. 261 [113 S.Ct. at p. 752].) The court merely found that requiring a defendant's presence at the beginning of a trial serves to assure that any waiver is a knowing one. (*Ibid.*) The court therefore did not rule that the right to be present at the beginning of trial could never be waived under any circumstances.

In the case at bar we do not deal with a federal rule of court; rather, we deal with the wording of Penal Code sections 1043 and 977. Penal Code section 1043, subdivision (b) allows a court to continue with a trial in the absence of a defendant only when a trial has commenced in the defendant's presence and a defendant is disruptive or has voluntarily absented himself. However, subdivision (d) of Penal Code section 1043 expressly provides that subdivision (b) shall not limit the right of a defendant to waive his right to be

present as long as the waiver is in accordance with Penal Code section 977. Since a written waiver executed in open court under Penal Code section 977 also serves to assure that the waiver is a knowing one, we find no constitutional bar to making such a waiver effective, even when it includes a waiver of the right to be present at the commencement of the trial. This statutory waiver procedure at issue is quite broad and does not expressly exclude from its reach the commencement of trial when the jury panel is brought in and sworn. It appears to apply to the commencement of trial as well as all other portions of the trial, with certain exceptions for sentencing, pleading, and other specified aspects of the trial.

We first examine the record to determine if defendant properly waived his right under Penal Code section 977, subdivision (b), to be present at the commencement of his trial. We note initially that no written waiver was executed in open court by defendant as required by Penal Code section 977, subdivision (b). Instead, defendant was advised by the court on April 19, 1999, that he had a right to be present in court, that if he failed to come out of his cell on the trial date it would be considered a waiver of his right to appear and to confront witnesses, that the jury would be picked in his absence, and that the trial would proceed in his absence. On June 15, 1999, two days prior to the trial date, defendant appeared in court and stated, "I am not going to make any further appearances in court . . . ." The trial court once again told defendant that he had a right to be present during trial and that if he refused to come out of his cell it would be deemed a waiver of his right to be present. Defendant in response stated unequivocally, "I'm not coming back, so do whatever you're gonna do. I'm not coming back." While this oral statement that defendant was not going to come back to court does not follow the precise language set forth in Penal Code section 977 for a written waiver of personal appearance, we find in light of the repeated admonitions given by the court, that defendant was fully informed of his rights and the intention of defendant to waive his personal appearance and remain in his cell was clear. To the extent that no written waiver was executed, any oral waiver obtained was not in accordance with the requirements of Penal Code section 977. (*People v. Garrison* (1989) 47 Cal.3d 746, 782-783 [254 Cal.Rptr. 257, 765 P.2d 419].) However, an oral waiver that does not comply with the written requirements of Penal Code section 977 does not constitute reversible error in all cases and may be found nonprejudicial depending on the circumstances. (47 Cal.3d at pp. 782-783.) The burden is on the defendant to demonstrate that his absence prejudiced his case or denied him a fair trial. (*Id.* at p. 783.) Defendant has failed to demonstrate any prejudice caused by commencing trial in defendant's voluntary absence, and we find no basis for reversal. (*Ibid.*)

The next question before this court is whether a defendant, who was in custody, and who did not waive his appearance at the time of commencement of trial in strict formal compliance with state law, can later complain

on jurisdictional or constitutional grounds that the trial commenced in his absence when defendant was advised that a failure to leave his cell to be transported to court for the commencement of trial would be considered a waiver of his right to be present, and subsequently chose not to leave his cell to be transported to court. We find that a defendant who refuses to come to court under such circumstances is estopped to assert that the trial improperly commenced in his absence. We note, moreover, that in the instant case defendant not only was advised that a failure to leave his cell would be considered a waiver of his right to be present, but (1) defendant responded to the admonition by affirmatively stating in open court that the court could do what it wanted to but he was not coming back for his trial, (2) no objection was made by counsel on jurisdictional grounds or constitutional grounds at the time trial commenced in defendant's absence, (3) defendant refused to come to court on the second day of trial after receiving another admonition at the jail, (4) defendant appeared on the third day of trial without making any objection and participated in the proceedings by personally making a motion to substitute counsel, (5) defendant admitted in court during the third day of trial that it was his choice not to come to court when trial commenced, and (6) defendant appeared on the fourth day of trial, without objecting to the commencement of the proceedings in his absence, for the purpose of testifying in his own defense, and used the opportunity to inform the jury that the People were trying to put him away for 140 years in a Three Strikes case. We conclude that in such circumstances public policy demands a defendant be estopped to assert that the court violated his right to be present or acted in excess of its jurisdiction when it commenced trial in his absence. (See *In re Griffin* (1967) 67 Cal.2d 343, 347 [62 Cal.Rptr. 1, 431 P.2d 625] [defendant who seeks or consents to act in excess of jurisdiction is estopped to complain that the ensuing act is in excess of jurisdiction]; *People v. Collins* (1996) 45 Cal.App.4th 849, 862-865 [53 Cal.Rptr.2d 367] [defendant is estopped to assert a lack of jurisdiction when he seeks or consents to the act alleged to be in excess of jurisdiction and participates in the act].)

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

D. *The Denial of Defendant's Motion to Represent Himself*

 Defendant contends that the trial court erred when it denied his motion to represent himself. He argues that he had an unqualified right under the federal constitution to represent himself and the trial court violated this right when it ruled his motion was untimely. He also asserts that even if his

*See footnote, *ante*, page 1380.

motion had to be made in a timely fashion, his motion in this case was timely in that it was made two days prior to the trial date and was unaccompanied by a motion to continue. We conclude that the decision whether to grant self-representation status to a defendant is discretionary when the motion is made within days of the trial date, and that trial court did not abuse its discretion when it found the motion to be untimely and denied it based on its findings that the motion was manipulative and that defendant was obstreperous and created a risk of disrupting the proceedings.

While a defendant has a federal constitutional right under the Sixth Amendment to represent himself, in order to invoke an unconditional right he must assert it within a reasonable time prior to the commencement of trial. (*People v. Welch, supra,* 20 Cal.4th at p. 729; *People v. Clark* (1992) 3 Cal.4th 41, 98 [10 Cal.Rptr.2d 554, 833 P.2d 561].) A motion that is not made within a reasonable time prior to trial is addressed to the sound discretion of the trial court. (*People v. Marshall* (1996) 13 Cal.4th 799, 827 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Clark, supra,* 3 Cal.4th at p. 98.) In exercising its discretion the trial court should consider such factors as the quality of counsel's representation, the defendant's prior proclivity to substitute counsel, the reason for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 959 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Marshall, supra,* 13 Cal.4th at p. 827.) Additionally, a trial court may deny such a motion if it finds it is made for the purpose of frustrating the orderly administration of justice. (*People v. Marshall* (1997) 15 Cal.4th 1, 23 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

Where a defendant raises the motion on the eve of trial, the trial court has discretion to deny the motion. (*People v. Clark, supra,* 3 Cal.4th at p. 98.) It has been expressly noted by this court that a motion made within three calendar days of the commencement of trial does not give rise to an unqualified right to self-representation, and a court has discretion to deny such a motion as untimely. (*People v. Rudd* (1998) 63 Cal.App.4th 620, 626 [73 Cal.Rptr.2d 807].) Indeed, in *People v. Ruiz* (1983) 142 Cal.App.3d 780, 789-791 [191 Cal.Rptr. 249], the court found a motion made six calendar days prior to trial was made in such "close proximity" to trial that the decision whether to deny it as untimely was within the discretion of the trial court.

When a trial court exercises its discretion to deny a motion for self-representation on the grounds it is untimely, a reviewing court must give "considerable weight" to the court's exercise of discretion and must examine

the total circumstances confronting the court when the decision is made. (*People v. Ruiz, supra,* 142 Cal.App.3d at p. 792.) Among the factors a court may consider in exercising its discretion when ruling on a motion made in close proximity to trial or after commencement of trial is whether defendant's prior conduct has demonstrated a likelihood that proceedings would be disrupted in the event the motion for self-representation was granted. (*People v. Jenkins, supra,* 22 Cal.4th at pp. 962-963.) This includes a consideration of defendant's manner and demeanor, any previous disruptive behavior, any refusals to come to court whereby he absented himself from the proceedings, and any lack of control over his emotions that would demonstrate a risk of disruption of future court proceedings. (*Ibid.*) In exercising its discretion a court may rely on a defendant's previous conduct whereby he absented himself from the proceedings, and the court need not credit any assurances made by defendant at the time of the motion that he would appear in court each day and not cause any further disruption of the proceedings. (*Id.* at p. 962.) The trial court can also consider the risk that a particular defendant might tell jurors of matters that the court had withheld from them. (*Ibid.*)

 As previously summarized in this opinion, defendant had refused to come to court on many occasions, and had disrupted the proceedings on the few occasions he did appear. He was found to have malingered and pretended to be physically and mentally disabled in an effort to thwart the criminal justice system from working in his case. He did everything he could to sabotage the proceedings, including fighting with deputies, acting as if he was being attacked by imaginary "bugs" or people, claiming to be possessed by different people, claiming to have various physical maladies that prevented him from coming to court, not cooperating with doctors or mental health experts, not cooperating with his attorneys, stripping naked while in the holding tank to prevent having to go into the courtroom, and rubbing feces on himself to prevent his extraction from his cell when he refused to go to court. Given this lengthy and consistent history of disruptive behavior, the trial court acted well within its discretion when it found the motion for self-representation was manipulative and that defendant posed a real risk of disrupting future proceedings if the motion was granted.

Moreover, the court was entitled to reject defendant's assertions that he would behave properly in the future, and its decision in this regard was fully supported by the record. The judges of our courts are entitled to conduct their proceedings in an orderly and just fashion, and are not required to place their dockets and courtrooms at the mercy of obstreperous and unruly defendants with long track records of disruptive behavior. Such defendants, may not thwart the functioning of the criminal justice system in this state by

making manipulative motions designed to result in the disruption of serious court proceedings for the perceived benefit of the defendant. Just as defendants have certain rights in court, so do courts have the power to preserve their dignity and their basic ability to function. In this case the court acted properly in denying the motion for self-representation and no abuse of discretion occurred.

E.-I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is modified to strike rather than stay the two prior prison term enhancements under Penal Code section 667.5, subdivision (b). The judgment is also modified to award 164 days of conduct credit rather than 162 days, so that the total presentence credits are 492 days rather than 490 days. The clerk of the superior court is directed to modify the abstract of judgment to delete reference to any prior prison term enhancements being imposed and stayed, since the prior prison term allegation for *People v. Howze* (Super. Ct. L.A. County, 1983, No. A027034) was stricken during trial and since the prior prison term enhancements for *People v. Howze*, *supra*, No. A028550, and *People v. Howze* (Super. Ct. L.A. County, 1990, NA002921) have been stricken on appeal. The clerk is further directed to modify the abstract of judgment to reflect that defendant is awarded 164 days of conduct credit rather than 162 days, and that the total presentence credit is 492 days rather than 490 days. The clerk is then directed to forward the corrected abstract to the Department of Corrections. The judgment is affirmed in all other respects.

Armstrong, Acting P. J., and Godoy Perez, J., concurred.

A petition for a rehearing was denied January 30, 2001, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 25, 2001. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1380.